## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **MIDWEST CURTAINWALLS, INC.,** | : | **Case No. 1:07 CV 1435** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **AMERICAN BRIDGE/EDWARD KRAEMER & SONS, A JOINT VENTURE, et al.,** | : | **MEMORANDUM & ORDER** |
| **Defendants.** | : | |

Before the Court is Plaintiff Midwest Curtainwalls, Inc.'s ("MWC") *Motion to Reinstate Litigation and for Leave to File Amended Complaint* (Doc. 8).  MWC moves the Court for an Order re-opening this case and permitting it to file an amended complaint on the grounds that Defendants American Bridge/Edward Kraemer & Sons, A Joint Venture, the American Bridge Company, and Edward Kraemer & Sons, Inc. (collectively, "AB/K") breached the terms of the settlement agreement.  This motion has been fully briefed, the Court conducted a hearing on the motion, and it is ripe for adjudication.  For the reasons set forth below, the motion is **GRANTED in part**.

## I.    BACKGROUND

### A.    THE WOODROW WILSON MEMORIAL BRIDGE

The Woodrow Wilson Memorial Bridge spans the Potomac River between Virginia and Maryland, near Washington D.C.[1]  The Bridge is enormous – it carries both Interstate 95 and the Capital Beltway (Interstate 495).  Perhaps the most distinguishing feature of the Bridge, however,

---

[1]  *See* Wikipedia.org, Woodrow Wilson Bridge, http://en.wikipedia.org/wiki/ Woodrow_Wilson_Bridge (last visited March 27, 2009).

is that it is a bascule bridge--one of the only drawbridges on the United States Interstate Highway System.[2]  Perched atop the drawbridge is a structure enclosed in glass known as the Operator's House.  The operator of the bridge can see both the bridge and the river from inside the glass-enclosed Operator's House, and, thus, raise and lower the drawbridge safely.

For some years, the State of Maryland Highway Administration ("MSHA") has been renovating the Bridge.

### B.      PROCEDURAL HISTORY

#### 1.      The Relationship of the Parties

This lawsuit relates to the construction of the Operator's House.  Specifically, it involves a dispute regarding the construction of the glass, metal, and concrete "curtainwall system" that forms the exterior walls of the Operator's House.[3]

In February, 2003, AB/K contracted with MSHA to act as the general contractor for the construction of various aspects of the Woodrow Wilson Memorial Bridge, including the Operator's House.  AB/K then sub-contracted construction of the curtainwall system for the Operator's House to McCoy, Associates, Inc. ("McCoy").  In turn, in April of 2003, McCoy sub-sub-contracted all of the curtainwall work to MWC, a Cleveland, Ohio, company in the business of anything and everything to do with curtainwall systems.   Subsequent to the sub-sub-contract, MWC communicated directly with AB/K regarding construction; McCoy did not act as the middle-man.[4]

---

[2] *Id*.

[3] A curtainwall is a building facade typically consisting of an aluminum frame filled with glass windows.

[4] Prior to the filing of the complaint in this case, McCoy assigned all of its claims against AB/K to MWC.

### 2.    The Defective Specifications Claims Against MSHA

After execution of the sub-subcontract, MWC began designing and manufacturing the curtainwall system for the Operator's House.  Unfortunately, in the process of that work, MWC discovered that the specifications issued by MSHA for the curtainwall system were defective.  This caused MWC to incur additional design and labor expenses to the tune of approximately $473,000.00, as well as approximately $251,000.00 in damages due to delay.

As a result, MWC submitted damages claims to AB/K on behalf of itself and McCoy.  In August, 2003, AB/K asserted the damages claims up the chain to MSHA, in the form of a Defective Specification Claim.  MSHA denied the claims, and AB/K filed an action in the Maryland Court of Claims on behalf of McCoy and MWC.  While the Defective Specification lawsuit was pending, AB/K negotiated a change order with MSHA.  As part of the change order, AB/K unilaterally released the delay portion of the damages claim against the state even though it was simultaneously asserting that claim on behalf of McCoy and MWC in the state court.

AB/K, MWC and McCoy also negotiated a Liquidation Agreement to prevent conflicts amongst themselves while the Defective Specification lawsuit was pending.  The Liquidation Agreement prohibited the parties from suing one another while the Defective Specifications lawsuit was pending, and provided that proceeds of any settlement would be distributed among the parties on a *pro rata* basis.

### 3.    Defective Concrete Construction by AB/K

In April, 2006, MWC was on the job and prepared to install the curtainwall system, but found that it could not do so because AB/K had improperly constructed the concrete structure for the Operator's House.  As a result, MWC incurred additional expenses related to, *e.g.*, delay, re-

-3-

engineering, and materials.  This problem festered between the parties, eventually inspiring AB/K to refuse to pay all of the additional costs, MWC to withhold certain materials necessary to finalizing the curtainwall system, and AB/K to file a lawsuit in the Cuyahoga County Court of Common Pleas. The filing of this lawsuit violated the Liquidation Agreement, and was dismissed accordingly, but not until MWC and McCoy had allegedly incurred $44,000.00 in attorneys' fees.

### 4.      MSHA's $400,000.00 Offer of Settlement

Subsequently, in November, 2006, MSHA offered to pay McCoy and MWC $400,000.00 for their design and labor damages to settle the Defective Specifications lawsuit in the Maryland courts. MSHA refused to compensate them for any portion of the delay damages, however, noting that AB/K had already released this claim.  At the time, MWC was unwilling to accept the offer because of the defective concrete dispute that had arisen in the interim and because it did not want to release its claim against AB/K for the delay portion of the Defective Specifications claims AB/K had unilaterally forfeited.

### 5.      History of this Lawsuit

#### i.      The Original Complaint

MWC filed this lawsuit on May 16, 2007.  (Doc. 1.)  The complaint alleges fourteen counts asserting various claims for compensatory and punitive damages and attorneys' fees arising out of the parties' relationship during the course of the work on the Operator's House and the various disputes relating thereto.

#### ii.      Settlement & Dismissal Order

The parties settled this lawsuit almost immediately, however, entering into a Settlement Agreement in late May, 2007.  MWC filed a *Motion for Order of Dismissal* (Doc. 4) on May 30,

2007, seeking an Order of dismissal in light of the settlement agreement.  Attached as an exhibit to the *Motion for Order of Dismissal* was a proposed *Journal Entry of Dismissal* (Doc. 4-2) signed by both parties.  On June 11, 2007, the Court dismissed the case, issuing the *Journal Entry of Dismissal* as jointly proposed by the parties.  (Doc. 7 ("Dismissal Order").)  By virtue of the Dismissal Order, the Court expressly retained jurisdiction over the matter, as requested by the parties.

### iii.    Motion to Re-Open the Case

Approximately nine months after the Court dismissed the case, MWC filed the *Motion to Reinstate Litigation and for Leave to File Amended Complaint* ("Motion to Reinstate") (Doc. 8) presently before the Court.  In its Motion to Reinstate, MWC contends that AB/K breached the settlement agreement and, therefore, according to the terms of the June 11, 2007, Dismissal Order (Doc. 7), the Court should issue "an Order reinstating the . . . litigation and allowing the filing of the Amended Complaint attached hereto."  (Doc. 8 at 1.)  In its Motion to Reinstate, MWC quotes the following portion of the third paragraph of the Dismissal Order as the sole basis of its request for an Order re-opening the case and permitting it to file the Amended Complaint.

> [T]he Court shall retain jurisdiction to entertain a Motion by [MWC] to Reinstate this litigation, which reinstatement will be effective as of the date of the filing of the Complaint in this action, in the event that Defendants do not comply with the terms of a certain settlement agreement referenced in the Motion For Order Of Dismissal.

(Doc. 7 at 1.)  As stated by MWC in their brief in support of the Motion to Reinstate:

> Since the Defendants have failed to comply with the Settlement Agreement, it is now necessary for [MWC] to move the Court for an Order reinstating the above-referenced litigation and permitting Midwest to file with the Court the attached Amended Complaint.

(Doc. 8 at 3.)

### iv.  The Settlement Agreement

AB/K filed a response in opposition to MWC's Motion to Reinstate, arguing that the Court should not re-open the case because AB/K has not breached the Settlement Agreement and because MWC had not tendered-back substantial benefits it received under that agreement.  Consequently, certain terms of the Settlement Agreement are important to the resolution of this motion.  (*See* Settlement Agreement, Doc. 8-14.)

The Settlement Agreement requires AB/K to pay MWC $605,000.00 according to the terms set forth in § 8.  In sum, the total settlement amount consists of three payments:

(1)  $109,226.00 to be paid within ten days of the execution of the Settlement Agreement;

(2)  $95,774.00 to be paid "in accordance with the terms of MWC's Sub-Subcontract and in accordance with paragraph 8.2 below[;]" and

(3)  $400,000.00 to be paid within three business days of completion of the work.

(Doc. 8-14 § 8.1.)[5]  The first payment – $109,226.00 – represents the agreed settlement amount; it is not specifically attached to any disputed claim or issue.[6]  The second payment – $95,774.00 –

_____

[5]  Section 8.1 of the Settlement Agreement provides:

8.1     The parties agree that [AB/K] will pay MWC a total settlement amount of . . . ($605,000.00).  The proceeds will be distributed in three (3) payments as set forth below.  The first payment of . . . ($109,226.00) will be paid within ten (10) days of execution of this Agreement.  The second payment of . . . ($95,226.00) will be paid in accordance with paragraph 8.2 below.  The third payment of . . . ($400,000.00) will be paid within three (3) business days of completion of the work.  For purposes of the timing of the $400,000.00 payment, completion is defined in paragraph 8.2.  Receipt of payment by [M]SHA is a condition precedent to [AB/K's] distribution of $400,000.00 to MWC.

(Doc. 8-14 § 8.1.)

[6]  Based on the submissions at the hearing, it appears that this was a negotiated figure designed to compensate MWC for some of the expenses incurred by virtue of the contract delays and for at least some portion of MWC's costs in connection with the state court action filed and

represents a combination of two debts.  First, $53,059.45 is the amount of the final contract payment for the curtainwall work, plus retainage, due from MSHA.  Because of the parties' contractual arrangements, this money has to pass through AB/K to MWC.  Second, $42,714.55 is the amount AB/K owes MWC directly.  The third payment – $400,000.00 – represents the proceeds from the settlement of the Defective Specification lawsuit in the Maryland courts against MSHA.

It is undisputed that AB/K made the first and third payments in accordance with the sub-subcontract.  Only the second payment – $95,774.00 – is outstanding.  This is the basis of MWC's Motion to Reinstate.  While MWC argues that the payment was not timely made, AB/K contends that its payment obligation was not ripe as of the filing of the Motion to Reinstate.

Payment of the $95,774.00 is premised on § 8.2 of the Settlement Agreement.  Section 8.2 provides as follows:

> 8.2    AB/EKS's payment of $400,000.00 to MWC must be made within three business days of completion of the work. AB/EKS will, within three business days of signing of this Agreement, execute and deliver any necessary and required documentation to SHA to receive the $400,000.00. AB/EKS will provide copies of this documentation to MWC. For purposes of the payment of the $400,000.00 by AB/EKS to MWC, completion of the work would be defined in accordance with the following:
>
> The glass installed, the copings installed, the mullions (exterior and interior caps) installed, the joints caulked with silicone, and the system having passed the AAMA 501.2 water test as defined on page 292 of the Special Provisions.
>
> MWC represents that the glass in its possession is ready for installation. If in shipment or during storage or installation, the glass is broken or cracked, or otherwise flawed, MWC will install the defective glass and installation of the flawed glass would be considered completed for purposes of this paragraph. MWC must replace the defective glass and AB/EKS will not withhold the $400,000.00 payment. If MWC broke the glass such that it could not be installed, or dropped the glass in the river, or for some other unforeseen reason could not install the glass, MWC must order new glass and install it upon receipt. AB/EKS must deposit the $400,000.00 in an interest

---

dismissed here in Ohio.

bearing account, with the interest for the benefit of MWC, until the new glass was installed. For purposes of this paragraph, completion also requires MWC to submit all required warranties and other document required by SHA under its Sub-Subcontract for payment of the final payment of $95,774.00 to MWC. Transfer of these documents is not grounds for withholding the $400,000.00.

The $400,000.00 bears interest at an annual rate of ten percent (10%) until paid, regardless of when MWC completes the work. Interest will not accrue until AB/EKS receives the $400,000.00 from SHA. ABK represents that it will do all things necessary to obtain the $400,000.00 payment from SHA as soon as possible.

(Doc. 8-14 § 8.2.)  The essence of § 8.2 is that AB/K's obligation to pay $95,774.00 is premised upon satisfaction of several conditions.  To receive the $95,744.00 payment, MWC must:  "submit all required warranties and other document [sic] required by [M]SHA under its Sub-Subcontract[.]" (*Id*.)

### v.    Post-Settlement Conduct

The parties do not materially dispute the factual history outlined above.  They disagree with respect to some of the important details of what happened between the dismissal of this case in June of 2007 and MWC's filing of the Motion to Reinstate on March 14, 2008, however.  As noted above, MWC does not take issue with AB/K's payment of two of the three components of the $605,000.00 settlement amount.  By August, 2007, AB/K had paid MWC $509,226.00 – *i.e.*, $400,000.00 representing the settlement of the Defective Specification Claims with MSHA and $109,226.00 representing the agreed settlement payment.  MWC contends that the third payment – $95,774.00 – was due on October 11, 2007, ten days after MWC demanded payment by letter invoice after determining that all conditions precedent had been satisfied.

Specifically, the parties' evidentiary submissions, considered jointly, present the following

post-settlement timeline related to the $95,774 payment:[7]

- August 28, 2007: MSHA issued a letter confirming that the curtainwall system had been "installed per the contract specifications" and had passed the required water test;

- September 3, 2007: MWC submitted various warranties and documents required under the sub-subcontract and Settlement Agreement to AB/K;

- September 22, 2007: MWC submitted to AB/K what it regarded as the final warranty required – the Cricursa glass warranty;

- September 26, 2007: MSHA paid AB/K in full for the line item associated with the curtainwall system;

- October 1, 2007: MWC submitted its final invoice to AB/K demanding payment of the outstanding settlement amount, $95,774.00;

- October 11, 2007: Payment due according to MWC;

- November 16, 2007: Counsel for MWC sent an email message to Counsel for AB/K regarding the unpaid invoice and Counsel for AB/K responded that AB/K had not yet been paid by MSHA (despite the fact that it had been paid on September 22, 2007 as stated above);

- December 5, 2007: MWC received a letter from AB/K regarding a broken vertical sliding door and notifying MWC of its request for maintenance service;

- February 12, 2008: MWC received a letter from AB/K regarding punch list items and requesting repair of these items;

- February 15, 2008: MWC sent a letter to AB/K demanding payment from both AB/K ($42,714.55) and MSHA ($53,059.45) in accordance with the terms of the Settlement Agreement, and contesting any obligation to repair the punch list items as a condition precedent to payment;[8]

- February 21, 2008: AB/K sent a letter to MWC contesting its obligation to pay the requested amount because the conditions precedent – including repair of the punch list items, receipt of funds from MSHA, receipt of a proper glass warranty from Cricursa, and approval of warranties by MSHA – had not yet been satisfied, and offering a "progress payment" of

---

[7] This summary of the facts is derived from the exhibits admitted into evidence at the hearing on this motion (Docs. 28, 35), as well as the exhibits attached to the parties' briefs.

[8] MWC also asserted an entitlement to interest beginning November 1, 2007.

$48,493.55;

- February 25, 2008: MWC rejected AB/K's progress payment offer, contesting that the conditions to the payment had been satisfied and asserting that the Settlement Agreement had been breached;

- March 14, 2008: Motion to Reinstate and proposed Amended Complaint filed;

- March 31, 2008: MSHA accepts all of the warranties submitted by MWC;

- April, 2008: AB/K offers to pay MWC the $95,774.00 outstanding under the Settlement Agreement.[9]

### vi.     The Proposed Amended Complaint

The proposed Amended Complaint (Doc. 8-2) reflects this procedural history, and it also sheds some light on why MWC refuses to accept the $95,774.00 payment now that AB/K is tendering it. Simply put, the Motion to Reinstate seeks to revive virtually all of the monetary claims MWC surrendered by settling the case. If the parties had performed perfectly under the Settlement Agreement, MWC would have $95,774.00 more than it has right now. Based on the proposed Amended Complaint, however, MWC could recover substantially more than that. The proposed Amended Complaint asserts the following ten claims:

- Count 1 is a breach of contract claim for $280,000.00 – the amount MWC was allegedly damaged as a result of AB/K's unilateral release of the delay portion of the Defective Specification Claim against MSHA;

- Counts 2 and 3 are a conversion and unjust enrichment claim, respectively, for the same $280,000.00 alleged in Count 1;

- Count 4 is a breach of contract claim for $107,798.72 – the amount MWC was allegedly damaged as a result of the defective concrete work by AB/K;

- Counts 5 and 6 are a quantum meruit and unjust enrichment claim, respectively, for the same $107,798.72 alleged in Count 4;

---

[9] At the hearing on this motion, the parties stipulated to this fact. They could not agree, and thus did not stipulate to, a specific date in April on which this offer was presented.

-10-

- Count 7 is a breach of contract claim for $44,000.00 in legal fees associated with the defense of the lawsuit AB/K filed against MWC's bonding company while the Defective Specification Claim was still pending, the filing of which breached the Liquidation Agreement;

- Count 8 is a claim for breach of the Settlement Agreement in the amount of $42,714.55;[10]

- Count 9 is a breach of the duty of good faith and fair dealing associated with AB/K's alleged duty to deal with the MSHA on MWC's behalf; and

- Count 10 is a claim for punitive damages in excess of $1 million, costs, and fees.

(Doc. 8-2.)

Notably, in its proposed Amended Complaint, MWC neither expressed an intention to tender back the $509,226.00 it had already received from AB/K nor contemplated that those payments would serve as an offset to any claim it could assert.  At the hearing, MWC argued that it is entitled to retain the benefits received under the settlement and still pursue all claims it would have had against AB/K had no settlement ever been reached.  While it backed off that broad contention to some extent in its post-hearing submission, MWC is still steadfast in its assertion that it has no obligation to tender back the payments received.

### vii.  MWC's Arguments in Support of Re-Opening

The initial point of contention is whether MWC satisfied the warranty condition in § 8.2 of the Settlement Agreement.[11]  MWC's position is that (1) the language of the Settlement Agreement says payment is contingent upon "submission" of warranties; and (2) MWC submitted all of the

---

[10]  This reflects the portion of the $95,774.00 payment that is due directly from AB/K as opposed to from MSHA passed through AB/K.

[11]  The parties also vigorously debate whether MWC was obliged to repair the punch list items identified by AB/K, in particular a certain sliding vertical door on the Operator's House, as a condition precedent to receiving the $95,744.00 payment.  The Court finds it unnecessary to resolve this question in light of its findings with respect to the warranty condition.

required warranties as of September 22, 2007.  Therefore, MWC argues that all of the conditions had been satisfied as of its October 1, 2007 invoice and that the $95,774.00 payment was due at that time.  MWC admits that the warranties were not accepted until March 31, 2008 – after the Motion to Reinstate was filed.  MWC argues that this is irrelevant, however, because payment was never conditioned upon MSHA's <u>acceptance</u> of the warranties.  MWC contends that AB/K cannot and has not pointed to any contract or document so conditioning payment of the $95,774.00 settlement amount.  In support of its argument, MWC quotes § 8.2 of the Settlement Agreement, which states that MWC must "***submit*** all required warranties and other document [sic] required by [M]SHA under its Sub-Subcontract for payment of the final payment of $95,774.00 to MWC."  (Doc. 8-14 § 8.2 (emphasis added).)

MWC also makes a more involved argument regarding AB/K's contractual obligations to notify sub-contractors when it determines it has grounds to withhold a payment that is otherwise due.  MWC notes that § 8.1 of the Settlement Agreement states that the $95,744.00 payment "will be paid in accordance with the terms of MWC's Sub-Subcontract and in accordance with paragraph 8.2. below."  (Doc. 8-14 § 8.1.)  Section 4 of the sub-subcontract states as follows:

> Progress payments, less retainage of five percent (5%), shall be made to Midwest for Work satisfactorily performed no later than ten (10) days after receipt by McCoy of payment from Customer for Midwest's work.  Final payment of the balance due shall be made to Midwest no later than ten (10) days after receipt by McCoy of final payment from Customer for Midwest's Work, subject to the express condition precedent of payment therefore by Customer.  Those payments are subject to receipt of such lien waivers, affidavits, warranties and guarantees required by the Contract Documents, and McCoy may withhold and retain out of moneys due Midwest amounts sufficient fully to reimburse and compensate itself and the Customer or to indemnify itself and the customer against liens, claims, delays, obligations or liabilities which may be asserted against both or either of them, or their property or Surety, by reason of or as a result of any acts or omissions of Midwest.

(Sub-subcontract: McCoy/MWC, Docs. 28, 35, Deft. Ex. 3 § 4.)  MWC also points to the following

-12-

provision of the MSHA's Standard Terms and Conditions:

> The Administration has established the following time frame for subcontractor payment: When a progress, semi-final, or final payment is processed and payment is received by the Contractor [*i.e.*, AB/K], payment shall be made to all subcontractors [*i.e.*, MWC through McCoy] within 10 days.
> . . .
> If the Contractor withholds payment from a subcontractor beyond 10 days, the Contractor shall:
>> (a)     Notify the subcontractor in writing and state the reason why payment is being withheld; and
>> (b)     Provide a copy of the notice to the construction project Engineer and the District Engineer.

(Standard Terms and Conditions, Doc. 28, Deft. Ex. 5 § TC-5.03.)  Based on these provisions, MWC argues that AB/K had an obligation to either (1) pay MWC within ten days of receiving the payment from MSHA on September 26, 2007 or (2) notify MWC in writing and explain the grounds for withholding the payment.  Because AB/K did neither after receiving a the payment from MSHA on September 26, 2007, MWC argues that AB/K breached the Settlement Agreement <u>even if</u> payment of the $95,744.00 is contingent upon acceptance of warranties (as opposed to submission).

MWC's position is that the Court should grant the Motion to Reinstate, and grant it leave to amend the complaint, pursuant to the language of the Dismissal Order (Doc. 7) because AB/K has breached the Settlement Agreement. (*See* Doc. 35 at 92-93.)  It contends that the fact of breach, any breach, of the settlement agreement revives all claims it would have had against AB/K in the absence of the settlement.

### ix.     AB/K's Arguments in Opposition to Re-Opening

AB/K disputes that <u>submission</u> of warranties (as opposed to acceptance) is sufficient to satisfy the condition precedent to the $95,774.00 payment, but contends that, regardless, MWC had not even submitted all of the required warranties at the time it filed the Motion to Reinstate.

-13-

Specifically, AB/K presented testimony and exhibits demonstrating that, in 2005, the parties agreed to adjust the terms of the warranty from Cricursa warranting the glass MWC used for the curtainwalls against thermal stress breakage.  (*See* Dep. J. Daniel Bell ("Bell Dep."), Doc. 30-2 at 42-53.)  Because the MSHA was concerned about the ability of the glass to withstand the stresses to which it will be subjected, it requested a longer warranty term.  Instead of beginning the warranty at the date of "substantial completion," the parties agreed to begin the two-year warranty coverage at "final acceptance."[12]  (*See* Docs. 28, 35, Deft. Ex. 12.)  In fact, at the time, MSHA predicted that final acceptance would not occur until April, 2008.  Despite this agreement to modify the warranty, the Cricursa thermal stress warranty MWC submitted on September 22, 2007, did not include the modification – it included a beginning date clearly prior to final acceptance.

AB/K admits that MSHA ultimately accepted the Cricursa thermal stress warranty as submitted on March 31, 2008, but argues that, until that point in time, MWC had not complied with the terms of the Settlement Agreement and AB/K had a right to, and an important interest in, holding back the payment.  AB/K explains that, for example, if the Cricursa glass had broken during that period of time, AB/K would have been responsible to MSHA.

In support of this contention, AB/K points to the fact that § 8.2 of the Settlement Agreement expressly conditions payment receipt of all "***required*** warranties." It reasons that the negotiated agreement to modify the Cricursa thermal stress warranty in 2005 proves that the warranty "*required*" by MSHA was the agreed modified version, not the non-compliant Cricursa warranty MWC actually submitted.  Therefore, MWC did not "submit all required warranties."

---

[12]  In fact, at the time, MSHA predicted that final acceptance would not occur until April, 2008.  (*See* Docs. 28, 35, Deft. Ex. 18.)  This was a very accurate prediction, as MSHA finally accepted the warranties on March 31, 2008.  (*See id*., Deft. Ex. 35.)

AB/K also cites the same language from the sub-subcontract MWC referenced in its argument regarding payments made to sub-contractors.

> Those payments are subject to receipt of such lien waivers, affidavits, warranties and guarantees required by the Contract Documents, and McCoy may withhold and retain out of moneys due Midwest amounts sufficient fully to reimburse and compensate itself and the Customer or to indemnify itself and the customer against liens, claims, delays, obligations or liabilities which may be asserted against both or either of them, or their property or Surety, by reason of or as a result of any acts or omissions of Midwest.

(Sub-subcontract: McCoy/MWC, Docs. 28, 35, Deft. Ex. 3 § 4.) According to AB/K, this language explicitly supports their argument that the contractor has a right to hold back payments to compensate for potential problems and claims associated with MWC's failure to submit the proper Cricursa thermal stress warranty for the glass.

AB/K also argues that it was not required to make the $95,774.00 payment under the Settlement Agreement until MSHA <u>accepted</u> all of the required warranties. In support of this proposition AB/K cites § 8.2 of the Settlement Agreement again – "completion also requires MWC to submit all required warranties and other document [sic] required by [M]SHA under its Sub-Subcontract for payment of the final payment of $95,774.00 to MWC." Although AB/K's argument on this point is less than crystal clear, it implicitly argues that the March 31, 2008 letter from MSHA accepting all warranties is one of the "other documents required." (*See* Doc. 10 at 5-6.)

Lastly, AB/K contends that, in the event the Court re-opens this lawsuit, MWC will be required to tender-back the payments $509,226.00 it has already received pursuant to the Settlement Agreement. AB/K characterizes this as rescission of the contract, *i.e.*, the Settlement Agreement, requiring the parties to return benefits received under the terms of the contract. Because the Settlement Agreement includes a choice of law provision in favor of Maryland, AB/K asserts that

-15-

this issue is governed by Maryland state law.

II.  **DISCUSSION**

    A.    **THE NATURE OF THIS PROCEEDING**

    Before turning to the relative merits of the parties' positions, there is a threshold issue that must be resolved: what standards govern the Court's consideration of this Motion to Reinstate? Although it appears MWC initially believed a mere *allegation* of a breach would be sufficient to justify automatic re-opening, this question was essentially ignored by the parties.  It is surprisingly thorny, however.

    The point of departure is the language of the Dismissal Order, which does <u>not</u> say that the mere allegation of a breach justifies re-opening the case.  Instead, it says that the Court has jurisdiction to "***entertain***" a motion to reinstate the case in the event of non-compliance with the Settlement Agreement.

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Court shall retain jurisdiction to entertain a Motion by Midwest to Reinstate this litigation, which reinstatement will be effective as of the date of the filing of the Complaint in this action, in the event that Defendants do not comply with the terms of a certain settlement agreement referenced in the Motion for Order of Dismissal.

(Doc. 7.)  First, the provision presupposes that the Court actually finds non-compliance with the Settlement Agreement, not merely that such non-compliance is alleged.  Second, the Dismissal Order does not say non-compliance will automatically result in reopening.  Instead, it provides that the Court will "entertain a motion" to reinstate, which indicates that the Court will exercise some level of discretion in determining whether "reinstituting" the case is appropriate, and, if so, what the scope of any such revival should be.

    Several legal principles are pertinent to the nature and scope of the Court's consideration of

-16-

MWC's Motion to Reinstate.  First, having expressly retained jurisdiction in the Dismissal Order (as quoted above), there is no question that the Court has jurisdiction to entertain this motion.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (noting that a court has ancillary jurisdiction to enforce a settlement agreement when a provision of a dismissal order retains jurisdiction over the settlement); *see also Re/Max Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 643-45 (6th Cir. 2001).

Second, the language of the Dismissal Order raises a potential tension between two principles: (1) the Court's inherent authority to enforce its own orders and (2) the contractual nature of settlement agreements.  That is, what if the Court's understanding is not entirely consistent with the parties' intent?  The Court "always has jurisdiction to enforce its own orders."  *McAlpin v. Lexington 76 Auto Truck Stop, Inc.*, 229 F.3d 491, 504 (6th Cir. 2000) (citing *Kokkonen*, 511 U.S. at 380-81). Similarly, and for obvious reasons, a Court's interpretation of its own orders is entitled to deference. *Kendrick v. Bland*, 931 F.2d 421, 423 (6th Cir. 1991); *In re Zevitz*, 230 F.3d 1361, 2000 WL 1478371, at *1-*2 (6th Cir. Sept. 28, 2000) (table).  This principle is tempered, however, by the fact that an agreed order is contractual in nature and, accordingly, should be interpreted using standard rules of contract interpretation, especially adherence to the parties intent.  *See City of Covington v. Covington Landing Ltd. P'Ship*, 71 F.3d 1221, 1227 (6th Cir. 1995); *Liberte Capital Group, LLC v. Capwill*, 99 Fed. Appx. 627, 633 (6th Cir. 2004) (noting that the court must balance the contractual nature of agreed orders against the principle that a court is best situated to interpret its own orders).

The Dismissal Order brings this potential tension to the fore.  It is the Court's Order.  It was <u>not</u> filed as a Rule 41(a)(1) stipulated dismissal because the parties wanted the Court to retain

jurisdiction for purposes of "entertaining" a motion to reinstate.  Although it is an agreed order, it was approved and issued by the Court based on <u>the Court's</u> understanding of its meaning and effect. This is certainly not an uncommon method of dismissing a settled case.  What is peculiar about this Dismissal Order is that it requires the Court to interpret the parties' intentions with respect to nature and scope of the Court's authority to resolve the motion contemplated by the Dismissal Order itself.

      In the interest of reconciling this tension, the Court notes that the standards applicable to a motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(6) may be instructive in fleshing out the scope of the Court's task.  Rule 60(b)(6) states:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons; . . . (6) any other reason justifying relief from the operation of judgment.

Fed. R. Civ. P. 60(b)(6).  Rule 60(b)(6) can provide relief from judgment, but only in "extraordinary circumstances" where "principles of equity mandate relief."  *Harbinson v. Bell*, 503 F.3d 566, 569 (6th Cir. 2007); *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 469-70 (6th Cir. 2007). The Sixth Circuit, moreover, recently stated that "a district court should hesitate to decline to enforce a working settlement agreement."  *G.G. Marck & Assoc., Inc. v. Peng*, Case Nos. 07-4180, 4251, 2009 WL 260768, at *6 (6th Cir. Feb. 5, 2009) (citing *Mustangs Unlimited*, 487 F.3d at 470).  In *Mustangs Unlimited*, 487 F.3d at 469, the Sixth Circuit "emphasize[d] the importance of the general policy favoring enforcement of settlement agreements" in reversing a district court's order granting relief from judgment under Rule 60(b)(6).

      While the Court is not faced with a Rule 60(b)(6) motion, the Sixth Circuit's disinclination toward Rule 60(b)(6) motions to vacate a dismissal compared to motions to enforce a settlement is nonetheless instructive.  It suggests that, in "entertaining" the Motion to Reinstate, the Court should

adhere as closely as possible to the parties intentions in the Settlement Agreement, including, but not limited to, and without over-emphasizing, the provision related to filing a Motion to Reinstate. <u>Again, that provision of the Settlement Agreement instructs the Court to engage in a two-step analysis: (1) determine whether a breach has occurred and (2) if it has, determine the appropriate scope of re-opening.</u>  With this in mind, the Court concludes that, as the movant, MWC has the burden of proving that the Settlement Agreement was breached by AB/K, and of convincing the Court that the breach it has proven justifies the broad relief it seeks, *i.e.*, a full reopening of this action with no limitation on the claims it may assert against AB/K.[13]

### B.    ANALYSIS

#### 1.    Step One: Was there a Breach of the Settlement Agreement?

The dispositive factual question on the issue of whether a breach has occurred is:  at what point in time was the $95,774.00 payment due?  More specifically, whether a breach of the Settlement Agreement occurred turns on the question of timing *vis-a-vis* the Cricursa thermal stress warranty.  For the reasons explained below, the Court finds that MWC did not submit the required

---

[13]  Were the Court <u>not</u> bound by the two-step procedure established in the Dismissal Order, it would seem that, pursuant to Maryland law, a pure breach of contract analysis would require MWC to tender-back the payments received under the Settlement Agreement because MWC is seeking rescission.  *See, e.g., Maslow v. Vanguri*, 896 A.2d 408, 423-31 (Md. Ct. Spec. App. 2006) (citing *Lazorcak v. Feurstein*, 327 A.2d 477, 481 (Md. 1974)).  MWC argues that it is not seeking rescission because the Settlement Agreement expressly allows it to repudiate the Settlement Agreement while <u>retaining</u> the $509,226.00 AB/K already paid under the agreement, essentially, to "have its cake and eat it too" (at least until, after re-opening the case, this Court finds it appropriate to set-off the amount previously paid under the Settlement Agreement against any amount MWC ultimately recovers).  (Doc. 36 at 2-3, 5-6 (citing the default provision of the Settlement Agreement, Doc. 8-14 at § 9.2).)  If required to reach this issue, which it is not because of the language of the Dismissal Order, the Court likely would reject MWC's interpretation of the default provisions of the Settlement Agreement, and find that the language of the Settlement Agreement actually <u>confirms</u> that MWC is seeking rescission, as AB/K argues in its post-hearing submission.  (*See* Doc. 33 at 4-5.)

warranties prior to filing this Motion to Reinstate.  Accordingly, the final payment under the Settlement Agreement of $95,774.00 was not due at the time MWC filed this Motion to Reinstate. The Court also finds, however, that AB/K did not adhere to all of the procedural requirements of the sub-subcontractor agreement in withholding at least part of the $95,774.00 payment. Consequently, although both parties substantially performed, neither party has fully complied with all of its contractual obligations.  Under these circumstances, the Motion to Reinstate is **DENIED in part and GRANTED in part**, as explained below.

### i.    MWC Failed to Submit the Required Warranties

MWC does not dispute that, pursuant to § 8.2 of the Settlement Agreement, the final payment was contingent upon submission of all required warranties.  At the hearing, AB/K presented evidence – by way of Mr. Bell's deposition and the cross-examination of Mr. Kelly – indicating that the parties and MSHA had agreed that the modified Cricursa thermal stress warranty was the required warranty.  (*See* Bell Dep., Doc. 30-2 at 33-45; Hrg. Tr., Doc. 35 at 60-62.)  Mr. Kelly, testifying on behalf of MWC admitted that MWC did <u>not</u> submit the modified Cricursa thermal stress warranty. (Hrg. Tr., Doc. 35 at 60-62.)  Therefore, MWC failed to satisfy the "submit all required warranties" condition precedent to payment.

MWC responds to this argument by asserting that AB/K breached a duty to notify MWC that it had not satisfied all of the conditions precedent to payment.  Specifically, MWC submitted unrebutted evidence indicating that (1) MSHA paid AB/K for all of the curtainwalls work in September of 2007; (2) AB/K denied that it had received the payment from MSHA and withheld a flow-through payment of $53,059.45 from MWC for in excess of ten days; and (3) AB/K did not notify MWC of the basis for withholding the payment.   As explained above, MWC contends that

this conduct violated the provision of § 8.1 of the Settlement Agreement requiring AB/K to adhere to the terms of the sub-subcontract, specifically, the procedures governing payment of sub-contractors. MWC's argument is compelling, and this is a close question. It ultimately fails to justify granting MWC's motion outright for several reasons, however.

First, there is no evidence indicating the $42,714.55 payment due directly from AB/K to MWC was subject to the provision of the sub-subcontract governing payments to subcontractors. The MSHA General Terms and Conditions which set forth the notice requirements upon which MWC relies apply to payments made from MSHA to the general contractor (AB/K) for work done by subcontractors such as MWC. Although MWC established that the source of the $53,059.45 portion of the $95,774.00 payment was MSHA, MWC did not present any evidence indicating that the remainder of the $95,774.00 was subject to this pass through condition. The proposed Amended Complaint, moreover, separates these claims and does not include any allegations refuting the Court's conclusion. Accordingly, MWC has not shouldered its burden with respect to almost half of the outstanding settlement payment.

### ii. AB/K Failed to Properly Notify MWC of Withholding

MWC has shown that a breach occurred with respect to the $53,059.45 in spite of this conclusion, however. AB/K did not present evidence indicating that it satisfied the notice condition with respect to this payment. AB/K's argument that the sub-subcontract permits withholding does not excuse the failure to adhere to the contractual process for doing so. In fact, AB/K's counsel admitted that the company's previous attorney had falsely represented to MWC that it had not received the payment from MSHA. Thus, the Court finds that AB/K breached the notice provision of the sub-subcontract with respect to the $53,059.45.

In February, 2008, however, prior to the filing of the Motion to Reinstate, AB/K tendered $48,493.55 to MWC as a progress payment, and explained the basis of its refusal to tender the entire $95,774.00.  (Hrg. Tr., Doc. 35; Doc. 28, Deft. Ex. 30.)  Among other alleged deficiencies, AB/K noted that the Cricursa warranty had not been properly submitted.  (*Id.*)  Had MWC accepted this payment its claim for breach would have been based on damages of less than $5,000.  As it stands, the fact that MWC rejected the partial payment indicates that it could be equitably estopped from asserting a claim based on AB/K's failure to make a payment MWC rejected, again making its claim premised upon a $5,000 debt.  Notably, although admittedly a hypertechnical reading of the sub-subcontract and Terms and Conditions, TC-5.03 does not prescribe a deadline for AB/K to notify MWC that it is withholding funds.  Furthermore, TC-5.03 also requires MWC to follow a certain process for notifying MSHA of AB/K's failure to make progress payments.  (Hrg. Tr., Doc. 35; Doc. 28, Deft. Ex. 5.)  MWC never alleges that it followed this process, suggesting that it is attempting to hold AB/K to account for a procedure it ignored itself.

### 2.    Step Two: The Extent to Which Re-Opening Is Appropriate

Although AB/K's hypertechnical arguments are a slender reed on which to base a decision denying the Motion to Reinstate, the Court is hard-pressed to conclude that the entire Settlement Agreement, over eighty percent of which has already been performed, should be scrapped on the basis of MWC's arguments.  The general principle favoring enforcement of settlement agreements cuts both ways.  While MWC seeks to aggressively enforce its right to eviscerate the settlement due to a delay in the payment of a small portion of the settlement proceeds, AB/K seeks to protect its right to insist on strict compliance with the non-trivial procedural prerequisites to payment, *i.e.*, submission of all required warranties.

-22-

Under these circumstances, the Court finds it appropriate within the confines of the terms of the Dismissal Order to re-open the case to permit MWC to litigate only certain, limited claims. First, as noted above, the Dismissal Order does not define the extent of the Court's discretion to resolve the Motion to Reinstate, it simply requires the Court to "entertain" it. (Doc. 7.) Given this latitude, the Court finds that it has the implied authority to sever the components of the Settlement Agreement in the interest of promoting enforcement of the Settlement Agreement generally, as opposed to just certain provisions of the Settlement Agreement. This particular contract lends itself to severance because the parties neatly divided the amount of the settlement into three distinct payments. These payments represent a fully negotiated compromise of <u>both</u> parties' claims. The Court thus **RE-OPENS** the case and **GRANTS** MWC leave to file an amended complaint, but only as described herein.[14]

First, the $400,000.00 payment has already been made and relates strictly to the Defective Specification Claim. The Court finds that MWC is entitled to keep this payment. MWC shall not assert any claims related to this payment or the underlying Defective Specification Claim in the amended complaint against AB/K. In addition, the claims for delay damages related to the circumstances that gave rise to the Defective Specification Claim and referenced in Counts I, II, and III of the proposed Amended Complaint were pass-through claims attributable to MSHA. The right to recover those payments was settled in return for the entire $400,000.00 payment from MSHA.

---

[14] While the Court finds that tailoring a specific remedy is the most appropriate course of action under the odd circumstances of this case, it is important to note that AB/K's false representation that it had not been paid by MSHA in the Fall of 2007 is very troubling. AB/K's present counsel attributes this blatant falsehood to a miscommunication between AB/K's former counsel and management. Even if this is true, it is inexcusable. In an entirely different category (*i.e.*, under the heading "Baffling" as opposed to "Appalling"), is MWC's steadfast refusal to accept the final payment under the Settlement Agreement when AB/K tendered it in April of 2008. As the politicians say, 'mistakes have been made.'

The Court, moreover, cannot resolve MWC's claims for delay damages.  MWC asserts that AB/K failed to protect its rights against MSHA.  However, the release of these claims against MSHA makes it impossible for the Court to now determine whether MSHA's reliance on the contract amendments as a waiver was valid or enforceable, or whether MSHA would have been liable for such damages.  Accordingly, Counts I, II, III, and IX of the proposed Amended Complaint (Doc. 8-2) are hereby barred.

The second payment -- $109,226.00 – has also been paid in full.  This payment is not tied to anything specific; it reflects the negotiated resolution of the claims.  While AB/K is not entitled to a tender-back of the settlement amount, MWC may not assert Counts IV, V, VI, and VII of the proposed Amended Complaint (Doc. 8-2), which are fairly encompassed by this payment.

The parties may litigate, however, their claims related to the amount reflected in the third component of the Settlement Agreement, the $95,774.00 payment.  The Court hereby **GRANTS** MWC's Motion to Reinstate for the limited purpose of permitting MWC to assert the following claims:

(1)     Breach of the Settlement Agreement, but only as to the $95,774.00 payment and not in a manner inconsistent with any portion of this Order (see Count VIII of the proposed Amended Complaint, Doc. 8-2);

(2)     Pre-judgment interest in connection with the Breach of Settlement Agreement claim;

(3)     Consequential damages flowing from the alleged breach of the  Settlement Agreement, if any, and only to the extent recoverable under Maryland law.

The Court hereby **GRANTS** MWC leave to file an amended complaint consistent with this Order within fourteen (14) days of the date of this Order.

-24-

III.     **CONCLUSION**

For the foregoing reasons, Midwest Curtainwalls, Inc.'s *Motion to Reinstate Litigation and for Leave to File Amended Complaint* (Doc. 8) is **GRANTED in part**.  The Court hereby **DENIES** Midwest Curtainwalls, Inc. leave to file the proposed Amended Complaint (Doc. 8-2) but **GRANTS** it leave to file an Amended Complaint consistent with this Order within fourteen (14) days of this Order.  This case is hereby **RE-OPENED** upon the terms and conditions stated in the *Journal Entry of Dismissal* (Doc. 7), and as described herein.


        **IT IS SO ORDERED.**


                                        **s/Kathleen M. O'Malley**
                                        **KATHLEEN McDONALD O'MALLEY**
                                        **UNITED STATES DISTRICT JUDGE**


 **Dated: March 31, 2009**